975 A.2d 333

**Donald FISCHBACH**

v.

**Greer FISCHBACH.**

**No. 1080, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

July 7, 2009.

66 

Marietta B. Warren, Annapolis, MD, for Appellant.

Stephen P. Krohn (Krohn & Krissoff, P.A., on the brief), Annapolis, MD, for Appellee.

Panel: DAVIS, SALMON and DEBORAH S. EYLER, JJ.

DAVIS, Judge.

This case involves a dispute as to whether Donald Fischbach, appellant, should be required to pay Greer Fischbach, appellee, a sum of $19,936 in pension arrears.[1] On January 15, 2008, appellee filed a complaint in the Circuit Court for Anne Arundel County requesting an award of pension arrears against appellant, which appellant was alleged to have accrued from the date of his retirement in 2001 through 2007. Appellant filed an answer, asserting the defenses of waiver and laches, and he also filed a motion for summary judgment. After hearing argument by counsel on June 30, 2008, the trial court (Jaklitsch, J.) denied appellant's motion for summary judgment. A trial on the merits was conducted that same day. At the conclusion of trial, the trial court entered judgment in favor of appellee. On appeal, appellant asks us to review three questions,[2] which we have consolidated as follows:

I. Did the trial court abuse its discretion by denying appellant's motion for summary judgment?

II. Did the trial court err by awarding appellee $19,936.00 in pension arrears?

For the reasons that follow, we answer both questions presented in the negative and affirm the judgments of the Circuit Court for Anne Arundel County.

---

1. The trial court ruled that appellant was required to pay a total arrearage of $24,515.93 minus the amount of taxes paid by appellant on those arrears, an amount which the parties stipulated to be $19,936.00 This amount represents the total recorded judgment against appellant.

2. The questions, as originally presented, are as follows:
 1. Did the trial court err in denying [appellant's] Motion for Summary Judgment?
 2. Did the trial court err in failing to make any findings of fact or conclusions of law regarding appellant's defenses of waiver or laches raised in both his motion for summary judgment and at trial?
 3. Did the trial court abuse its discretion in awarding [appellee] $19,936.00 in pension arrears?

## FACTUAL BACKGROUND

On October 5, 1990, the parties entered into a Separation Agreement, which was incorporated, but not merged, into the Judgment of Absolute Divorce entered on October 22, 1990 that terminated the marriage of the parties. The Separation Agreement, which was executed by both parties and placed under seal, provided, in pertinent part:

Husband shall pay to wife a portion of the pension he receives from his employer, C & P Telephone Company, if, as, and when he receives the same in an amount calculated by multiplying 40% times a fraction, the numerator of which is the number of years the parties have been married during which he has been accruing pension rights and the denominator of which is the total number of years he accrues pension rights as of the date of his retirement, further multiplied by the total amount of the pension he will receive from the said employer. Husband shall assign to Wife, assuming he can do so, an amount of the survivor benefits in the said pension equal to the percentage of the said pension the Wife shall receive hereunder, with the further understanding that, in the event there is any cost for him to do so, whether a one time cost or a continuing deduction from the said pension, the Wife shall bear said expense to the extent it is necessary for her to receive the said percentage of the said survivor benefits.

The Judgment of Absolute Divorce provided that the court would retain jurisdiction to amend the order issuing the judgment pursuant to subsequently filed Qualified Domestic Relations Orders (QDRO) relating to the parties:

This Court shall retain jurisdiction to amend this Order to establish its qualifications under Annotated Code of Maryland, *Family Law,* and the United States Code, including specifically authority to make such modifications as to form to constitute a Qualified Domestic Relations Order (QDRO) constitute [sic] the Agreement of the parties entered therein.

Approximately eleven years later, in September 2001, appellant, a lineman, retired from Verizon, the successor to C & P Telephone. Appellant was sixty-two years old at the time. Thus, in 2001, appellant began to receive his pension benefits. Appellant made no effort to contact appellee to alert her to the fact of his retirement or the resulting payment of his pension benefits. In fact, both parties concede that "neither party made any attempt to contact the other until appellant received a proposed QDRO from appellee's attorney in February or March of 2006."

According to appellee's testimony at trial, she assumed that appellant would naturally retire at the age of sixty-five. Thus, in 2006, having heard nothing from appellant regarding his retirement, appellee approached an attorney to inquire about receiving her portion of appellant's pension benefits. Appellee subsequently learned that appellant had, in fact, retired in 2001. Accordingly, appellee initiated the process of preparing and submitting a QDRO in order to access future payments from appellant's pension benefits, as agreed to by the parties in their Separation Agreement.

On March 29, 2006, the circuit court entered a QDRO, jointly executed by the parties, that provided for the disposition of appellant's pension benefits. This QDRO was subsequently rejected by the pension plan administrator and a second, amended QDRO was signed by both parties and entered by the circuit court on April 23, 2007. Appellee began receiving pension benefits in September 2007, in the form of a lump sum payment of $7,710.65 and subsequent payments of $441.46 per month. Neither of the aforementioned QDROs addressed appellee's claim to pension arrears accumulated from the time of appellant's retirement to the point in time when the QDROs were filed.

On January 15, 2008, appellee filed a complaint in the Circuit Court for Anne Arundel County, alleging that she was entitled to $24,515.93 in pension arrears accrued during the seventy-three month period between appellant's retirement and appellee's receipt of the first partial payment pursuant to

the approved QDRO. Appellant answered and raised, *inter alia,* the affirmative defenses of statute of limitations, laches and waiver.

## Motion for Summary Judgment

Appellant subsequently filed a motion for summary judgment, arguing that the Separation Agreement constituted a "contract under seal," and, as such, was subject to a twelve-year statute of limitations pursuant to § 5–102(a)(5) of the Courts and Judicial Proceedings Article.[3] According to appellant, appellee's cause of action as to her right to his pension benefits accrued on October 5, 1990, the date that the Separation Agreement was executed. Thus, because appellee's complaint was filed on January 15, 2008, more than twelve years after the Separation Agreement was executed and placed under seal, appellant asserted that appellee's claim was barred by the statute of limitations. Appellant further contended that appellee waived her right to collect any benefits by failing to mention the arrearage in any of the QDROs submitted to the court. Finally, appellant argued that appellee's claim was barred by the doctrine of laches.

After hearing arguments by both counsel at a hearing scheduled for that purpose, the trial court denied appellant's motion for summary judgment.

## Trial

Both appellant and appellee testified at trial. Appellee testified that appellant began working at C & P Telephone in the mid–1960s, when he was approximately twenty-six to twenty-eight years old. Appellant was fifty years old at the time of the divorce. Notwithstanding the fact that the parties are parents to two adult children, appellee stated that she shared no communication with appellant, adding that appellant rarely visited with his children. Appellee stressed that she

---

3. Unless otherwise noted, all discussion of the Maryland Code in this opinion shall refer to the Courts and Judicial Proceedings Article, Md.Code (2006 Repl. Vol., 2008 Supp.).

never knew that appellant retired in September 2001 and assumed that he would retire at sixty-five years old. According to appellee, she first learned about appellant's retirement in September 2001 from her attorney, when, in 2005, appellee retained counsel in order to access pension payments. Appellant asserts that he was sixty-six years old at that time.

Appellee first began to receive benefits, pursuant to the aforementioned QDRO, in September 2007, when she received a lump sum payment and began to receive subsequent monthly payments from appellant's pension benefits. Appellee emphasized that she sought, through the instant lawsuit, to recover $24,515.93 in pension arrears.

According to appellant, the parties understood, during their marriage, that appellant could retire from his job anytime after thirty years of employment. He further testified that the company allowed him to retire at sixty-two years old, which he did, in September 2001. Although he testified that he never concealed his retirement, he also conceded that he never notified appellee about it. According to appellant, he first learned what a QDRO was when he was contacted by appellee's counsel. As for receiving pension benefits without deducting any portion therefrom for appellee, appellant testified:

Q What was your understanding regarding the fact that nothing was being taken out for your ex-wife?

A I really didn't give it much thought. I figured she would have a reason. I don't know, I got on with my life not just, I guess like I said remarried, got on with my life. My past was my past.

Appellant acknowledged, during cross-examination, that he understood that appellee was entitled to a percentage of his pension benefits and stated that he took "no steps, whatsoever" to notify her of his retirement. Appellant was further questioned as to whether appellee deserved any of his pension benefits:

Q Well, let's ask it a different way. You kept the money, didn't you?

A Yes, I kept the money. I worked 35 years for it.

Q It was your feeling then in 1990 when this agreement was signed and then again when you retired in 2001 that she wasn't entitled, didn't deserve any of it, isn't that right?

A Based on our divorce, why we are divorced, right.

Q You didn't think she deserved any of it?

A No, sir I don't now.

Q Well, that explains why you didn't tell her. In addition to that, with respect to the survivor benefit you were also required to provide her as the designated survivor beneficiary, were you not?

A I don't recall that, sir. No, sir. Why would I want my ex to be a survivor of anything?

At the conclusion of trial, the court ruled that the parties entered into a Separation Agreement on October 5, 1990, which provided appellee with the right to a portion of appellant's pension benefits. The court further found that appellant failed to notify appellee of his September 2001 retirement and began to receive the full amount of his pension benefits, without deducting any portion therefrom for appellee. The court, in determining that the period of time between appellant's retirement and appellee's actual receipt of benefits was seventy-three months, ruled:

The issue in this case, at least one of the issues, involves when [appellee] knew or should have known with due diligence, recently should have known of the wrong or when she knew she had a cause of action for these back benefits.

[Appellee] testified, and [appellant] as well, that there was no set date, at least during the parties [sic] marriage, of a retirement date. [Appellee] assumed that he would retire at the age of 65 and that was an appropriate time. [Appellant] testified that he would retire some time after 30 years and he did retire, as I mentioned, in September of 2001.

So, the Court finds *that it is reasonable and that* [appellee] *was on notice at least by the age of 65 that she had a*

*cause of action and that is when the cause of action accrued.* She did file her cause of action timely using the date of age 65 or 2005 as the date the cause of action accrued.

*Therefore, I find that it is not barred by the statute of limitations.* I find that she is entitled to $24,515.93 minus the amount for taxes. I would like to enter judgment if it's possible today so that if counsel can take a few minutes to calculate it.

Otherwise, I will keep the record open since both counsel did concede that that amount should be reduced by the appropriate taxes and I will enter judgment once that amount has been agreed upon for the $24,515.93 minus the amount agreed upon for taxes in favor of [appellee] against [appellant].

(Emphasis added).

## LEGAL ANALYSIS

### I

### Motion for Summary Judgment

Appellant initially argues that the trial court erroneously denied his motion for summary judgment. According to appellant, the following material facts are undisputed: (1) the parties' Separation Agreement, which was incorporated into the October 22, 1990 Judgment of Absolute Divorce, entitled appellee to receive a portion of appellant's pension benefits; (2) appellee only took action to collect these benefits in 2006, over fifteen years after ·the agreement between the parties was executed and placed under seal; and (3) neither appellee's first QDRO, entered by the court on March 29, 2006, nor the subsequently amended QDRO, entered on April 23, 2007, mentioned arrearages or retroactive payments. Based on these undisputed facts, appellant contends that he was entitled to judgment, as a matter of law, on the grounds of statute of limitations, waiver and laches. Appellant argues that the trial court "erroneously held that the statute of limitations does not begin to accrue until the benefit could be received and as such,

there was a dispute of material fact regarding when [appellee] could reasonably have known [appellant] retired." Appellant also faults the trial court for "fail[ing] to even address appellant's defenses of laches and waiver." We address each of these arguments *infra.*

## A

## Standard of Review

A trial court may "enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2–501(f). Although a trial court's decision to grant a motion for summary judgment is subject to *de novo* review on appeal, *see Harford County v. Saks Fifth Ave. Distrib. Co.,* 399 Md. 73, 82, 923 A.2d 1 (2007) (citing *Haas v. Lockheed Martin Corp.,* 396 Md. 469, 478, 914 A.2d 735 (2007)), a trial court has discretionary authority to *deny* a motion for summary judgment in favor of a full hearing on the merits, even when the moving party "has met the technical requirements of summary judgment." *Dashiell v. Meeks,* 396 Md. 149, 164–65, 913 A.2d 10 (2006) (citations omitted). "Thus, on appeal, the standard of review for a denial of a motion for summary judgment is whether the trial judge abused his [or her] discretion and in the absence of such a showing, the decision of the trial judge will not be disturbed." *Id.* (citations omitted). *See also Bouton v. Potomac Edison Co.,* 288 Md. 305, 311, 418 A.2d 1168 (1980) ("on appeal from a final judgment entered following a full trial of the general issue, we would not review a pretrial denial of a motion for summary judgment, other than for an abuse of discretions") (citing *Metro. Mortgage Fund v. Basiliko,* 288 Md. 25, 28–29, 415 A.2d 582 (1980)).

## B

## Factual Findings

In denying appellant's motion for summary judgment, the trial court ruled as follows:

Actually, it's a very interesting legal argument and there are not any Maryland cases that I was able to find on point. There are some cases that are out of jurisdiction that I do believe give some guidance, at least, with respect to what is appropriate in this case.

The cases, at least, from New York and Tennessee and some other jurisdictions dealing with this matter clearly indicate that the *statute of limitations begins to accrue when the benefit could have been received.*

*So, it could not be in this case.* Although, there was some suggestion that because the divorce was 1990 and the [QDROs] weren't done that somehow it should relate back to 1990, I think, is not appropriate and that the operable date is at least the date of retirement or when [appellee] knew, or should have known, that [appellant] was going to retire.[4]

In this case there is a question of dispute as to when [appellee] could have reasonably known when [appellant] retired. So, for that reason I don't believe it is an appropriate case to decide. *As a matter of law, I believe there is a factual dispute. So, therefore, I am going to deny the motion for summary judgment.*

(Emphasis added).

Thus, in denying appellant's motion for summary judgment, the trial court focused entirely on the merits of appellant's argument as to the statute of limitations and did not expressly address appellant's arguments that he was entitled to summary judgment on the grounds of waiver or laches. Appellant asks us to hold that the lack of any specific findings of fact or conclusions of law in the trial court's ruling as to these specific grounds for summary judgment constituted error, requiring reversal of the trial court's judgment.

---

4. The trial court actually stated that "the operable date is at least the date of retirement or when the Defendant knew, or should have known, that the Plaintiff was going to retire," but corrected itself in the next sentence and referred to the "dispute as to when the Plaintiff could have reasonably known when the Defendant retired."

██ As we have stated, a judge may deny a motion for summary judgment even if that motion is technically correct, merely because the judge wishes to hear the evidence produced at a full hearing on the merits. We, therefore, are not inclined to hold that the trial court abused its discretion by failing to render specific findings regarding appellant's affirmative defenses of waiver and laches in ruling on the motion for summary judgment. Moreover, we have previously recognized that there may be instances when a trial court, in granting a motion for summary judgment, will not necessarily have placed on the record its reasons for doing so. Thus, in our review of a trial court's decision to grant summary judgment, "[i]f the trial court did not specify the grounds upon which it granted summary judgment, appellate courts assume that the trial court 'carefully considered all of the asserted grounds and determined that all or at least enough of them . . . were meritorious.' " *Kimmel v. SAFECO Ins. Co.*, 116 Md.App. 346, 354–55, 696 A.2d 482 (1997) (quoting *Bond v. Nibco, Inc.*, 96 Md.App. 127, 133, 623 A.2d 731 (1993)).

██ We see no reason to treat the denial of a summary judgment motion any differently. In denying appellant's motion for summary judgment, we infer that the trial court implicitly rejected appellant's assertion that summary judgment was required in light of his asserted defenses. That the trial court did not expressly state the reasons for that rejection is not, in and of itself, grounds for reversal, particularly in light of the discretion afforded to trial courts in denying such motions, and when taking into account the remainder of our analysis in this opinion.

## C

### Statute of Limitations

[6] Appellant contends that the trial court erred, as a matter of law, when it denied appellant's motion for summary judgment on the grounds that appellee's claim was not barred by the statute of limitations. Appellant argues, and appellee

concedes, that the applicable statute of limitations is codified in C.J. § 5–102(a), which provides:

> (a) Twelve-year limitation.—An action on one of the following specialties shall be filed within 12 years after the cause of action accrues, or within 12 years from the date of the death of the last to die of the principal debtor or creditor, whichever is sooner:
>
> (1) Promissory note or other instrument under seal;
>
> (2) Bond except a public officer's bond;
>
> (3) Judgment;
>
> (4) Recognizance;
>
> (5) Contract under seal; or
>
> (6) Any other specialty.

Maryland Rule 8–131(a) provides that, ordinarily, a party cannot raise an issue on appeal unless the issue has been either raised in or decided by the trial court. Before the trial court, appellant argued that the Separation Agreement constituted an agreement placed under seal, subject to the twelve-year statute of limitations established in C.J. § 5–102(a)(5). Before this Court, however, appellant argues that the Separation Agreement, having been incorporated into the Judgment of Absolute Divorce, constitutes a judgment, subject to the twelve-year statute of limitations established in C.J. § 5–102(a)(3). In either event, the gravamen of appellant's argument is that appellee's ability to assert her cause of action expired twelve years after the specialty was formally recognized by the court. We further observe that the trial court based its denial of appellant's motion for summary judgment on the grounds that appellant's cause of action did not accrue from the date of the Judgment of Absolute Divorce, but rather, "when the benefit could have been received" and "when [appellee] knew, or should have known, that [appellant] was going to retire." Because the trial court decided the statute of limitations on those non-specific grounds, we find it appropriate to address the merits of appellant's claim.

■ Having considered whether appellant has preserved the issue for review, we turn to the merits of appellant's argument. To be clear, appellant does not challenge appellee's right to file QDROs in 2006 and 2007. Rather, appellant argues that appellee's lawsuit to recover her portion of pension benefits, *paid to appellant from 2001 through 2007,* was barred by the twelve-year statute of limitations set forth in C.J. § 5–102(a)(3). Appellant cites to *Lang v. Wilmer,* 131 Md. 215, 101 A. 706 (1917), in support of his assertion that "[i]t is black letter law in this State that limitations begin to run from the date the judgment is entered."

*Lang* involved a suit by a creditor who obtained a judgment by confession against a judgment debtor. *Id.* at 216, 101 A. 706. The Court of Appeals held that, "[w]here the defendant in a judgment dies, a *scire facias*[5] may be sued out to revive the judgment against the administrator alone to bind the assets in his hands, but where it is desired to review the judgment against the land of the deceased judgment debtor the *scire facias* should also issue against the heirs and terre-tenants." [6] *Id.* at 225, 101 A. 706. In that context, the Court of Appeals held that the "statute of limitations begins to run as to judgments from the date of the judgment, and is not suspended by the death of the judgment debtor, or neglect of those entitled to administration upon his estate." *Id.* at 227, 101 A. 706 (citations omitted).

*Lang* is factually and legally inapposite. We find instructive, instead, *Marshall v. Marshall,* 164 Md. 107, 163 A. 874 (1933).[7] In *Marshall,* a divorce decree entered on November

---

5. A *scire facias* is a "writ requiring the person against whom it is issued to appear and show cause why some matter of record should not be annulled or vacated, or why a dormant judgment against that person should not be revived." BLACK'S LAW DICTIONARY 1373 (8th Ed. 2004).

6. The Court explained that terre-tenants are " '[a]ll who are in possession, deriving under the judgment debtor, such as heirs, devisees or alienees, after the judgment.' " *Lang,* 131 Md. at 225, 101 A. 706 (citations omitted).

7. Part of the holding in *Marshall, supra,* was later restricted on other grounds not relevant to this appeal. *See Jensen v. Jensen,* 103 Md.App.

23, 1905, required one spouse to pay alimony and child support to the other spouse until the beneficiaries' death or remarriage. *Id.* at 109–10, 163 A. 874. The defendant paid support, as required by the decree, for several years, but discontinued payments for a variety of reasons. *Id.* at 110, 163 A. 874. The plaintiff sought an attachment against the defendant's interest in a personal estate to which the defendant "recently" became entitled. *Id.* An order granting the attachment was later rescinded by the lower court, which also disallowed the plaintiff's claim as to support arrears. *Id.* at 111, 163 A. 874. The plaintiff appealed. *Id.* In ruling, the Court explained:

It is conceded that no sums *which became payable* under the decree more than twelve years *before the filing of the petition for the enforcing process* can be recovered, in view of the Code provision that no "bill, testamentary, administration or other bond (except sheriffs' and constables' bonds), judgment, recognizance, statute merchant, or of the staple or other specialty whatsoever, except such as shall be taken for the use of the State, shall be good and pleadable, or admitted in evidence against any person in this State after the principal debtor and creditor have both been dead twelve years, *or the debt or thing in action is above twelve years' standing.*" Code, Art. 57, Sec. 3.[8]

164 Md. at 114–15, 163 A. 874 (emphasis added).

The Court then distinguished the support decree at issue from those that "survive the death or marriage of the person for whose benefit they were originally entered":

Preliminary to an execution on a decree like the one now under consideration, a proceeding to ascertain the amount of the unpaid installments, and the existence of the conditions upon which its enforcement is dependent, would be

---

678, 690–91 n. 6, 654 A.2d 914 (1995) (explaining that, under *Marshall* and other cases, a court could reserve jurisdiction as to alimony and grant alimony "long after the grant of an absolute divorce," but that, "[u]nder the present law, a chancellor's power to reserve is more limited") (citations omitted).

**8.** The statute to which the Court cited is a predecessor to C.J. § 5–102.

essential. That course was followed in the present case. Until the passage of an order determining the amount due and authorizing execution, the decree would not become a lien on the defendant's property, but *would only have the effect of an adjudication of liabilities thereafter maturing at stated periods.* Upon a proper petition and order such a decree may be enforced by execution or attachment as to all unpaid installments which *may have become due* within the *preceding* twelve years. When a supplemental order to that end is procured, it should be docketed and indexed as an original decree or judgment creating a lien.

*Id.* at 116, 163 A. 874 (emphasis added). Thus, in the context of a proceeding initiated to enforce a defendant's compliance with a divorce decree establishing support obligations, the Court held that the decree could be enforced by execution or attachment as to all unpaid installments that became payable twelve years *before* the petition to enforce such payments is filed.

The Court's opinion in *Bradford v. Futrell,* 225 Md. 512, 171 A.2d 493 (1961), is similarly instructive. In *Bradford,* a decree entered on August 10, 1960, ordered a father to pay arrears to a mother in an amount equaling the total of several unpaid installments of child support owed by the father under an October 1944 divorce decree. *Id.* at 514–15, 171 A.2d 493. The father appealed, in part, on the grounds that the mother's claim for arrearages was barred by limitations or laches. *Id.* at 521, 171 A.2d 493. The Court of Appeals observed that *Marshall, supra,* was controlling on the issue of limitations. *Id.* at 522, 171 A.2d 493 (quoting *Marshall,* 164 Md. at 114–15, 163 A. 874). The *Bradford* Court also relied on the following passage from *Winkel v. Winkel,* 178 Md. 489, 506, 15 A.2d 914 (1940):

Another point decided [in *Marshall*] was that continuing periodical instalment payments of money under a decree were not barred by limitations as to those *which had severally become due within the twelve years next preceding the proceedings for enforcement.* The court did not hold that the agreed periodical payment must be paid if without

the statute of limitations, but carefully confined the application of the statute to 'the amount of the unpaid instalments, and the existence of the conditions upon which its enforcement is dependent' as ascertained by an appropriate proceeding.

The rule of limitations stated in *Marshall v. Marshall, supra,* would seem to apply to the periodical instalments of alimony under a decree, *to the extent that when such instalments separately became due the statute of limitations of twelve years began respectively to run severally as a bar to the enforcement of every such instalment,* if it had accrued due and remained undischarged.

*Bradford,* 225 Md. at 523, 171 A.2d 493 (quoting *Winkel, supra*) (emphasis added). The Court continued:

[W]hile Maryland does not follow the rule of some states that each installment for support becomes, when due, a final judgment on which execution may issue . . . our view as to the nature of support payments is in harmony with the approach to limitations that prevails in most jurisdictions, that the statute of limitations *begins to run against each installment of support payments from the date on which it accrues.*

*Id.* at 524, 171 A.2d 493 (emphasis added). Thus, the Court concluded:

From what has been said, it follows that the chancellor should have taken into account, in computing arrearages, only those installments *which accrued within twelve years prior to* April 16, 1958, when [the mother] *filed suit* in the District Court.

*Id.* at 525, 171 A.2d 493 (emphasis added).

Appellant cites to *O'Hearn v. O'Hearn,* 337 Md. 292, 301, 653 A.2d 446 (1995), to establish that a marital separation agreement, not under seal, but incorporated into a divorce decree, is governed by the twelve-year statute of limitations set forth in C.J. § 5–102(a). We do not disagree with this point in light of the fact that appellee in this case brought her complaint under the Separation Agreement, which was incor-

porated, but not merged into the Judgment of Absolute Divorce.[9] The Court of Appeals' decision in *O'Hearn*, however, further undermines appellant's position that the twelve-year statute of limitations, as to pension payments, begins to run from the date the divorce judgment was entered.

In *O'Hearn*, the appellee filed a petition for contempt on December 2, 1991, seeking arrearages in alimony and child support related specifically to medical and orthodontic bills incurred on behalf of the children since the divorce, which appellant was obligated to pay pursuant to an April 23, 1981 divorce decree that incorporated a separation agreement between the parties. *Id.* at 294, 653 A.2d 446. The appellant argued that bills and expenses incurred more than three years *prior to December 2, 1991*, the date when appellee filed the action, were barred by the three-year statute of limitations set forth in C.J. § 5–101. *Id.* at 295, 653 A.2d 446. In rendering its holding, the Court of Appeals observed that *Marshall, supra*, "described the procedures to be followed in a claim for arrearages in support payments":

[The appellee] followed the same procedure in the case at bar. The [April 23, 1981] decree of divorce was a judgment that [the appellee] sought to reduce to a monetary amount. She sought that remedy for those bills that had been *incurred* more than three years, but *less than twelve years, prior to December 2, 1991*[,] [the date on which the action was filed]. [The appellee] succeeded and obtained a money judgment for those amounts. As she sued on a judgment, the twelve-year statute of limitations applied.

337 Md. at 298, 653 A.2d 446 (emphasis added).

We are aware of no Maryland case applying the reasoning of *Marshall, Bradford* and *O'Hearn* under circumstances involving a claim regarding pension arrears. The holdings discussed *supra*, however, are fully applicable under

9. Appellee, for her part, concedes that the Separation Agreement is subject to the twelve-year statute of limitations set forth in C.J. § 5–102(a), although she, like appellant, refers to subsection (5) of that statute.

these circumstances. The Separation Agreement bound appellant to pay to appellee a fixed percentage of his pension benefits "if, as, and when" he received such benefits. The incorporation of the Separation Agreement into the Judgment of Absolute Divorce had the effect of adjudicating the liabilities of the parties "thereafter maturing at stated periods." *Marshall,* 164 Md. at 116, 163 A. 874 (quoted in *Bradford,* 225 Md. at 524, 171 A.2d 493). Thus, the proper procedure for seeking payment of pension arrearages was the filing of a proper petition and the issuance of an order enforcing the divorce decree "by execution or attachment as to all unpaid installments which *may have become due* within the *preceding* twelve years." *Id.* Stated alternatively, upon maturation of appellant's liabilities as to payment of his pension benefits, which occurs when an installment payment on those benefits becomes due, appellee is afforded twelve years from that point to enforce her rights as to that pension payment.

It would thwart justice to hold otherwise. In many instances, divorce judgments are entered decades before pension benefits may become payable. Under appellant's logic, a party must submit a QDRO within twelve years of the entry of a divorce judgment in order to preserve his or her right to access pension benefits that are paid more than twelve years after the entry of judgment. However, in *Potts v. Potts,* 142 Md.App. 448, 461, 790 A.2d 703 (2002), we observed:

> We have found no case, statute, or rule in Maryland or elsewhere that requires a QDRO to be filed within a specific time frame after a judgment of absolute divorce has been entered. Therefore, the timing of the presentation of the QDRO is dependent on the diligence of the parties and their counsel or the assertiveness of the trial court.

In the end analysis, we decline to treat the jurisdictional limitations on a party's efforts to enforce a divorce decree in relation to installment payments of pension benefits in a manner different from that set forth in the cases described *supra.*

We now turn to the trial court's ruling on appellant's motion for summary judgment. In denying appellant's motion, the trial court observed that "[t]he cases, at least, from New York and Tennessee and some other jurisdictions dealing with this matter clearly indicate that the statute of limitations begins to accrue when the benefit could have been received." [10] This statement is consistent with our assessment of Maryland law, which we have set forth *supra*. Under the facts of this case, appellant retired in September 2001. His pension benefits would have become payable sometime after that point. Appellee's January 15, 2008 complaint sought the payment of pension arrearages dating back to 2001. Because her claim as to

---

**10.** Appellant asserts that the cases to which the court referred are *Duhamel v. Duhamel*, 188 Misc.2d 754, 729 N.Y.S.2d 601 (N.Y.Sup.Ct. 2001), *adhered to on reconsideration*, 194 Misc.2d 100, 753 N.Y.S.2d 673 (N.Y.Sup.Ct.2002), *aff'd*, 4 A.D.3d 739, 772 N.Y.S.2d 437 (N.Y.App. Div.2004), and *Jordan v. Jordan*, 147 S.W.3d 255 (Tenn.Ct.App.2004). The trial court did not specifically refer to these cases in its ruling and we are unaware of the source for appellant's assertion. We address them nonetheless.

*Duhamel* addressed a party's challenge, based on the statute of limitations, to the filing of a QDRO. 729 N.Y.S.2d at 601–02. The Supreme Court of New York held that a statutory six-year period of limitations does not begin to run until a cause of action accrued, which was when the plaintiff's former husband reached "pay status" as to his retirement benefits. *Id.* at 602–03. On appeal, the Appellate Division of the Supreme Court of New York further held that submission of a QDRO is not the equivalent of the commencement of an action and that, because the "QDRO is derived from the bargain struck by the parties at the time of the judgment of divorce, there is no need to commence a separate 'action' in order for the court to formalize the agreement between the parties in the form of a QDRO." 772 N.Y.S.2d at 438–39.

*Jordan* involved another challenge, on statute of limitations grounds, to the filing of a QDRO, not the filing of a complaint. 147 S.W.3d at 257. The Court of Appeals of Tennessee held that a wife's "attempt to obtain approval of the plan administrator of the proposed QDRO and the entry of that order is not an action to enforce the divorce judgment, and hence is not barred by the ten-year statute of limitations." *Id.* at 263.

In light of our discussion of Maryland law, we need not determine the applicability of *Jordan* and *Duhamel*, although we note that they dealt with statute of limitations challenges to QDROs and not complaints for arrearages. Nonetheless, we do not find these cases to be inconsistent with our opinion in this case.

unpaid installments fell within the twelve-year period preceding January 15, 2008, her claims were not time barred by the twelve-year statute of limitations set forth in C.J. § 5–102(a).

We pause to address the trial court's statement that summary judgment was inappropriate because a "factual dispute" existed as to when appellee "knew or should have known" that appellant was retired. Ordinarily, the "discovery rule," which "tolls the accrual of the limitations period until the time the plaintiff discovers, or through the exercise of due diligence, should have discovered, the injury," applies "to all actions where limitations are governed by the three year statute of limitations, and has long applied in all manners of malpractice litigation." *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 95–96, 756 A.2d 963 (2000) (internal citations omitted). *See Poffenberger v. Risser*, 290 Md. 631, 636, 431 A.2d 677 (1981) (holding that the "discovery rule" is generally applicable to all causes of action). As we have explained, the complaint in this case is subject to the twelve-year statute of limitations set forth in C.J. § 5–102(a).

We are aware of no case law extending the application of the discovery rule to cases such as the one currently before us.[11] We need not decide the applicability of the discovery rule in this instance. There is no need to apply the discovery

---

11. Appellee concedes that the twelve-year statute of limitations set forth in C.J. § 5–102(a) is applicable to this case but then cites to C.J. § 5–101, which establishes a three-year statute of limitations for certain causes of action, along with a Fourth Circuit case construing C.J. § 5–101, in support of her argument that "limitations claims and laches are ineffective as a result of fraudulent concealment." *See Hartnett v. Schering Corp.*, 2 F.3d 90, 92–93 (4th Cir.1993) (explaining that, in Maryland, a cause of action in product liability and negligence cases, whose limitations are governed by C.J. § 5–101, accrues when the plaintiff knew or should have known that she had a cause of action). Appellee further cites to *Curtin v. Gildea*, 2 F.2d 865 (D.Md.1923), without explaining how this case is applicable. We observe that the trial court did not rule that appellant fraudulently concealed his date of retirement. *See* C.J. § 5–203 ("If the knowledge of a cause of action is kept from a party by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud."). Nor will we rule as such on appeal.

rule in this instance as appellant's claim sought the payment of
pension arrears that became payable within the twelve-year
period preceding her complaint. Thus, based on the trial
court's ruling in *toto,* and in light of the foregoing discussion,
we hold that the trial court did not abuse its discretion by
denying appellant's motion for summary judgment. Such a
grant of the motion on the grounds advanced by appellant
would have been contrary to the law.

## D

### Laches and Waiver

Appellant next argues that the trial court's "implicit rejec-
tion" of appellant's laches and waiver arguments constituted
an abuse of discretion.[12] Appellant's argument on this point
mirrors his challenge to the trial court's ruling rendered at the
conclusion of trial. Thus, for the sake of simplicity and to
avoid unnecessary repetition, we hold that the trial court did
not abuse its discretion by declining to grant appellant's
motion for summary judgment on the grounds of laches and
waiver. As to laches, as we shall explain, that equitable
defense was unavailable to appellant in this action, which
constitutes an action at law. As to contract waiver issues, the
trial court properly exercised its discretion to postpone ruling
on appellant's affirmative defenses until the court had the
benefit of hearing the evidence adduced at a trial on the
merits. The legal and factual background relevant to appel-
lant's claim of laches and waiver are set forth in the following
section of this opinion, where we address the propriety of the
trial court's ruling as to these two issues upon the conclusion
of trial.

---

**12.** As we have explained, the lack of specific findings at the summary
judgment level on laches and waiver does not require our reversal of
the trial court's judgment. As an aside, we are also unpersuaded by
appellee's assertion that appellant has "unclean hands" because he
concealed his retirement from appellee and cannot now complain of an
unjust delay through the defenses of laches and waiver. As we have
noted, the trial court did not find that appellant acted fraudulently in
concealing his retirement from appellee.

## II

### Trial Court's Judgment

Appellant challenges the trial court's ultimate judgment, awarding appellee $19,936 in pension arrears, on the same grounds he advanced in his assignment of error to the trial court's denial of his motion for summary judgment. We, accordingly, address each of these arguments.

### A

### Standard of Review

Maryland Rule 8–131(c) provides:

(c) Action tried without a jury. When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

" 'If any competent material evidence exists in support of the trial court's factual findings, those findings cannot be held to be clearly erroneous.' " *Figgins v. Cochrane*, 403 Md. 392, 409, 942 A.2d 736 (2008) (quoting *Schade v. Maryland State Bd. of Elections*, 401 Md. 1, 33, 930 A.2d 304 (2007)). When reviewing mixed questions of law and fact, " 'we will affirm the trial court's judgment when we cannot say that its evidentiary findings were clearly erroneous, and we find no error in that court's application of the law.' " *Conrad v. Gamble*, 183 Md.App. 539, 551, 962 A.2d 1007 (2008) (quoting *Storetrax.com, Inc. v. Gurland*, 168 Md.App. 50, 81, 895 A.2d 355 (2006), *aff'd*, 397 Md. 37, 915 A.2d 991 (2007) (citations omitted)). On the other hand, regarding pure questions of law, " 'the trial court "enjoys no deferential appellate review," and the appellate court "must apply the law as it discerns it to be." ' " *Id.* (quoting *Storetrax.com, Inc.*, 168 Md.App. at 81, 895 A.2d 355 (citations omitted)). Finally, "an appellate court may affirm a trial court's decision on any ground adequately shown by the record even though the

ground was not relied upon by the trial court or the parties." *YIVO Inst. for Jewish Research v. Zaleski,* 386 Md. 654, 663, 874 A.2d 411 (2005) (citing *Offutt v. Montgomery Co. Bd. of Edu.,* 285 Md. 557, 563 n. 3, 404 A.2d 281 (1979) (citations omitted)).

## B

### Statute of Limitations

At the conclusion of trial, the trial court ruled that appellee knew or should have known, by the time that appellant was sixty-five, that she had a cause of action related to enforcing the parties' agreements as to appellant's pension benefits. Thus, the trial court concluded that appellee's claim was not barred by the statute of limitations. We have held, *supra,* that appellee's claim was not barred by the twelve-year statute of limitations set forth in C.J. § 5–102(a)(3) and that a discussion as to whether the discovery rule applies in such situations is unnecessary. As we have explained, we may affirm a trial court's decision on any ground adequately established by the record even though the ground was not relied upon by the trial court or the parties. Thus, because we affirm the trial court's ruling that appellant's claim was filed within the applicable statute of limitations, we decline to address the applicability *vel non* of the discovery rule in this case.

## C

### Laches

Maryland Rule 2–323(g) provides that the doctrine of laches may be asserted by a party as an affirmative defense. Similarly, it may be invoked by a court on its own initiative. *See Liddy v. Lamone,* 398 Md. 233, 242–43, 919 A.2d 1276 (2007) (citations omitted). The Court of Appeals has reiterated that " '[t]here is no inflexible rule as to what constitutes, or what does not constitute, laches; hence its existence must be determined by the facts and circumstances of each case.' " *Id.* at 244, 919 A.2d 1276 (quoting *Ross v.*

*State Bd. of Elections,* 387 Md. 649, 669, 876 A.2d 692 (2005) (citations omitted)). The doctrine applies " 'when there is an unreasonable delay in the assertion of one's rights and that delay results in prejudice to the opposing party.' " *Id.* (quoting *Frederick Rd. Ltd. P'ship,* 360 Md. at 117, 756 A.2d 963 (2000) (citations omitted)).

This doctrine, however, is an equitable remedy. "In an action at law, the defense of laches is not available." *Whitcomb v. Horman,* 244 Md. 431, 440–41, 224 A.2d 120 (1966) (citing *Brashears v. Collison,* 207 Md. 339, 352, 115 A.2d 289 (1955) and *McHugh v. Martin,* 198 Md. 173, 180, 81 A.2d 623 (1951)); *see Smith v. Gehring,* 64 Md.App. 359, 370, 373, 496 A.2d 317 (1985) (holding that "neither Md. Rule 2–301, nor Md. Rule 2–323(g), nor any combination of them makes the doctrine of laches available as a defense to a purely legal claim" and that "[e]ven under 'merged' procedures, the doctrine of laches may not be applied to bar a legal claim that is timely under the applicable statute of limitations"). *See also Ross,* 387 Md. at 668–70, 876 A.2d 692 (discussing the history of the equitable doctrine of laches).

Appellee's complaint asked the trial court to enter judgment in her favor against appellant in the amount of $24,515.93, along with reasonable counsel fees and court costs and "such other and further relief as the nature of her cause may require." Appellee's action against appellant, which sought money damages, was thus an action at law. *See, generally, Ver Brycke v. Ver Brycke,* 379 Md. 669, 703, 843 A.2d 758 (2004) ("[W]hen characterizing whether a claim sounds in law or in equity, the determination is dependent upon the remedies sought."). Thus, the equitable doctrine of laches was not available as a defense to appellant in this action. The trial court was not required to give any consideration to this defense.

### D

### Waiver

In asserting that appellee has waived her right to seek arrears, appellant relies primarily on decisions which

address a party's waiver of the right, through subsequent conduct or agreements, to enforce contractual provisions. In drawing an analogy between those decisions and the case at hand, he asserts:

It is undisputed that Appellee prepared two QDRO's, one entered on March 29, 2006 and a subsequent amending order entered on April 23, 2007, which made absolutely no reference to or provisions for the $24,515.93 claimed in Appellee's Complaint. Appellee testified that she learned the appellant had retired in 2001 from her attorney in 2005. Despite this, she took absolutely no formal action to collect the $24,515.93 she claimed she was owed until filing suit on January 15, 2008, after she had convinced the Appellant to settle the retirement benefits dispute by the entry a QDRO, which made no mention of her subsequent claims. Appellee's claim is an attempt to get a second bite at the same apple, in suing for uncollectible arrears, using the separation agreement and judgment of divorce as grounds to get at benefits that were paid while she had been sleeping on her right to have a QDRO in place. Clearly, Appellee's actions are inconsistent with her subsequent attempt to enforce collection.

In support of his above assertion, appellant cites to *BarGale Industries, Inc. v. Robert Realty Co.*, 275 Md. 638, 643–44, 343 A.2d 529 (1975), where the Court of Appeals explained:

A waiver is the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from circumstances. "[A]cts relied upon as constituting a waiver of the provisions" of a contract must be inconsistent with an intention to insist upon enforcing such provisions.

(Citations omitted). Appellant also cites to our decision in *Progressive Cas. Ins. Co. v. Ehrhardt*, 69 Md.App. 431, 444–45, 518 A.2d 151 (1986) (citations omitted), where we stated: "The intention to waive a known right may result from an

express agreement or may be inferred from the facts and circumstances surrounding the case."

Appellant makes the following observation regarding the issue of whether one who files suit to recover pension arrears subsequent to the filing of a QDRO that makes no mention of such arrears and that seeks enforcement of pension benefits pursuant to a Separation Agreement and Judgment of Absolute Divorce of the parties, has waived the right to recover such arrearages: While this is a novel issue in Maryland, the New York case of *Boylan v. Dodge*, 42 A.D.3d 632, 839 N.Y.S.2d 580, 581 (N.Y.App.Div.2007),[13] is instructive. In *Boylan*, the Appellate Division of the Supreme Court of New York upheld a trial court's award of pension arrears and issued a QDRO directing the pension plan administrator to pay to the plaintiff the agreed-upon monthly pension payment plus an additional monthly payment to satisfy arrears accrued within the statute of limitations. Appellant contends that, "[u]nlike the former wife in *Boylan*, appellee chose to prepare and file two QDROS which did not make any provision for arrears."

Although appellant's argument makes reference to appellee's alleged "sleeping on her rights" by not filing suit until after the subject QDROs were prepared and executed by the parties, the thrust of his argument is that the QDRO modified the Separation Agreement between the parties or "created a new agreement regarding appellee's entitlement to appellant's pension benefits."[14] Appellant points to the following provisions of the final, approved QDRO, which we quote in full:

---

13. LexisNexis indicates that this opinion is uncorrected and subject to revision prior to release of the final, published version in the official reports.

14. In its motion for summary judgment, appellant contended:

In the case at bar, [appellee] unequivocally waived her right to collect any benefits paid prior to the entry of the March 21, 2006, QDRO by her failure to make any provision for retroactive payments. It is undisputed that not only did [appellee] know [appellant] had retired and had been collecting benefits prior to the entry of the first Order, but that [appellee] believed she was entitled to payment of benefits

## 6. Benefit Payable to the Alternate Payee

*The order assigns to the alternate payee an amount equal to 26.7% of the participant's monthly vested accrued benefit under the Plan,* but not to exceed the total value of the participant's accrued benefit at commencement. The amount awarded by the order shall be paid for the participant's lifetime until the earlier of (i) the death of the participant, or (ii) the death of the alternate payee. The alternate payee shall have no rights in or to any amount of the participant's accrued benefit under the Plan not assigned by this order.

After the alternate payee commences payment, the alternate payee shall have no right to any other increase in the participant's benefit under the Plan caused by the service, earnings, separation programs, or Plan amendments occurring subsequent to benefit commencement. Neither shall the alternate payee have any right to the portion to the participant's retirement benefit under the Plan that is not assigned in this order.

\* \* \*

## 8. Commencement

The alternate payee will commence payment if, as, and when the participant elects to commence benefits. In the event the participant is receiving a monthly annuity at qualification, *the alternate payee will commence payment as soon as administratively possible.*

Appellant relies heavily on the italicized portions of the above-excerpted provisions and argues that the plain language of the QDRO establishes that appellee waived her right to collect any pension benefits accruing prior to the QDRO. According to appellant, the "parties simply agreed that the benefits would be paid going forward."

---

paid since [appellant's] retirement. Despite this, [appellee] executed two QDROs, both of which modified the parties' Separation Agreement, which only provide for payment "as soon as administratively possible."

Appellee, in turn, argues that there "is no evidence whatsoever, either express or implicit from which the court could infer that the appellee gave up her right to receive a portion of her former husband's retirement," adding that "the opposite is true as evidenced by her testimony that she believed he retired at age 65 and when she was not notified, she promptly took action through counsel to institute her retirement benefits right [sic] a [QDRO]." Appellee also faults appellant for failing to present authority in support of his assertion that the pension plan administrator would have authority, in the absence of litigation, to award appellee pension arrears. Appellee stresses that appellant fraudulently concealed his retirement and cannot now complain that appellee waited too long in seeking payment.[15]

Section 8–205(a)(2)(i) of the Family Law Article of the Maryland Code provides a court with the authority to transfer an ownership interest in pension, retirement, profit sharing or deferred compensation plans from one party to another as part of the disposition of marital property in an annulment or divorce. A Qualified Domestic Relations Order (QDRO) is the vehicle by which pension benefits are transferred from one party to another, "either pursuant to the Marital Property Disposition Act, or through an attachment in aid of a support obligation." *Janusz v. Gilliam*, 404 Md. 524, 538, 947 A.2d 560 (2008) (citing *Rohrbeck v. Rohrbeck*, 318 Md. 28, 35–36, 566 A.2d 767 (1989)). We recently explained:

A QDRO is a creature of federal employee benefits law. We described QDROs in *Jenkins v. Jenkins*, 112 Md.App. 390, 397 n. 3, 685 A.2d 817 (1996), *cert. denied*, 344 Md. 718, 690 A.2d 524 (1997) stating:

QDRO's or Qualified Domestic Relations Orders are orders of a domestic relations court that come under an exception to the spendthrift provisions of ERISA (Employee Retirement Income Security Act, 29 U.S.C.

---

**15.** As noted, the trial court did not, at the motion for summary judgment level, conclude that appellant fraudulently concealed his retirement from appellee.

§§ 1001–1461). The ERISA provisions generally prevent the assignment or distribution of the proceeds of an ERISA qualified plan to third parties. A domestic relations order meeting certain qualifications (hence the QDRO moniker) for support or distribution of property may, however, require the allocation of all or part of a plan participant's benefits to an alternate payee. Use of this ERISA exception allows state trial courts effectively to alter title to otherwise untouchable pension plans without violating federal law.

Because "ERISA expressly preempts state law and made the regulation of pension plans a matter of exclusive federal interest," *Eller v. Bolton,* 168 Md.App. 96, 107, 895 A.2d 382 (2006), most employee pension plans are subject to ERISA's requirements. Therefore, in most circumstances, "[a] QDRO is required to transfer pension benefits from one beneficiary to another, either pursuant to the Marital Property Disposition Act, or through an attachment in aid of a support obligation." *Janusz v. Gilliam,* 404 Md. 524, 538, 947 A.2d 560 (2008).

*Barnes v. Barnes,* 181 Md.App. 390, 424–25, 956 A.2d 770 (2008).

The decision of the Court of Appeals in *Janusz, supra,* indicates that a QDRO may, under certain circumstances, modify a prior separation agreement between parties to a divorce. *Janusz* involved a Voluntary Separation and Property Settlement Agreement that was incorporated but not merged into the judgment of divorce entered on March 1, 2000. 404 Md. at 530, 947 A.2d 560. That agreement provided that Gilliam, the former husband, would maintain his survivor's annuity with the federal Civil Service Retirement System for Janusz's benefit. *Id.* at 528, 947 A.2d 560. Subsequently, a Court Order Acceptable for Processing, or "COAP," was executed on April 13, 2000 by the attorneys for both parties incident to the divorce. *Id.* at 532, 947 A.2d 560. Unbeknownst to the parties, appellant became ineligible for those benefits upon the granting of divorce. *Id.* at 528, 947 A.2d 560 (citing 5 C.F.R. § 838.802(b) (2008)). She was

informed of this fact by the Office of Personnel Management several years after the divorce became final. *Id.* at 533, 947 A.2d 560. Janusz accordingly filed suit and asked the trial court to rescind the original agreement between the parties or, in the alternative, to find that Gilliam had been unjustly enriched. *Id.* The trial court denied Gilliam's motion for summary judgment but, after a trial on the merits, ultimately denied Janusz's request for relief. *Id.* at 533–34, 947 A.2d 560. Janusz appealed. *Id.* at 534, 947 A.2d 560.

The Court of Appeals, first observing that it was required to interpret a property agreement incorporated, but not merged, into a Judgment of Absolute Divorce, held that "[s]uch agreements are subject to the general rules of contract interpretation." *Id.* at 534, 947 A.2d 560 (citing *PaineWebber, Inc. v. East;* 363 Md. 408, 413–14, 768 A.2d 1029 (2001)). The Court of Appeals concluded that mutual mistake of law is no basis for the rescission of a contract. *Id.* at 535, 947 A.2d 560. The Court further observed that in Maryland a claim of unjust enrichment " 'may not be brought where the subject matter of the claim is covered by an express contract between the parties.' " *Id.* at 537, 947 A.2d 560 (citations omitted). The trial court, relying on an exception to that general rule, which applies " 'when the express contract does not fully address a subject matter,' " *id.* (quoting *Dashiell,* 358 Md. at 100, 747 A.2d 600), ruled that the express agreement between the parties, *i.e.,* the property settlement agreement incorporated into the divorce judgment, did not expressly address what would happen if Janusz were deemed to be ineligible for the survivor's annuity. *Id.* at 537, 947 A.2d 560. The trial court further ruled that appellant had ultimately waived her right to file a cause of action for unjust enrichment based on the language of the agreement. *Id.* at 540, 947 A.2d 560.

The *Janusz* Court interpreted the language of the agreement between the parties, holding that the trial court erroneously concluded that Janusz had waived all future claims against Gilliam, including those pertaining to the Agreement itself. *Id.* at 540, 947 A.2d 560. The Court further held that the COAP established the obligation of the parties in the event

the Office of Personnel Management found such COAP to be unacceptable for processing. *Id.* at 538–39, 947 A.2d 560. The Court concluded that, if the trial court found the COAP, on remand, *to be an effective modification of the agreement between the parties*, then, as a matter of law, the agreement fully addressed the subject matter at hand, and Janusz could not be able to recover under a theory of unjust enrichment. *Id.* at 538, 947 A.2d 560. On the other hand, if, on remand, the trial court were to determine that the COAP was *not* an effective modification of the agreement, Janusz *could* proceed under a theory of unjust enrichment. *Id.* In so holding, the Court explained that a COAP is analogous to a QDRO:

A QDRO can be "either collateral to a judgment as an avenue for enforcement or it can be an integral part of the judgment itself." *Potts*, 142 Md.App. at 459, 790 A.2d at 710 (citing *Rohrbeck*, 318 Md. at 42–43, 566 A.2d at 774). In *Marquis v. Marquis*, 175 Md.App. 734, 757, 931 A.2d 1164, 1177 (2007), the Court of Special Appeals addressed an appellant's argument that a Constituted Pension Order ("CPO"), the functional equivalent of a QDRO for military retirement pay, modified the judgment of absolute divorce. Because the intermediate appellate court did not agree that the CPO modified the judgment, the court did not reach the question of whether such an order can effectively modify an earlier judgment. *Id.* In the present case, the COAP may be construed to be a modification to the Agreement. *If the trial court determines that the COAP is an effective modification of the Agreement pursuant to the requirements for modification set forth in the original Agreement, the COAP constitutes an integral part of the judgment itself and not merely an avenue for enforcement.*

*Id.* at 538–39, 947 A.2d 560 (footnote omitted) (emphasis added). The Court added, in a footnote:

Where, as here, an agreement is incorporated, but not merged, into a judgment, "the agreement survives as a separate and independent contractual arrangement between the parties." *Johnston v. Johnston*, 297 Md. 48, 56, 465 A.2d 436, 440 (1983). As such, after the entry of the final

judgment, the Agreement remained as an independent contract that the parties were free to modify, pursuant to the terms of their contractual arrangement.

*Id.* at 539 n. 10, 947 A.2d 560. Thus, the Court remanded the case for the limited purpose of determining whether the COAP constituted a valid modification of the original agreement. *Id.* at 541, 947 A.2d 560.

Appellant contends that appellee's *conduct* in preparing and filing QDROs that failed to mention the pension benefits accruing before the filing of those QDROs constituted a waiver of her right to later request those benefits. He relies on the principle that " 'It is elementary that either party to a contract may waive any of the provisions made for his [or her] benefit.' " *BarGale Industries,* 275 Md. at 643, 343 A.2d 529 (quoting *Twining v. Nat'l Mortgage Corp.,* 268 Md. 549, 555, 302 A.2d 604 (1973)) (citing *Shoreham v. Randolph Hills,* 248 Md. 267, 235 A.2d 735 (1967)). And, it is well settled that waiver, the intentional relinquishment of a known right, may "result from an express agreement or be inferred from circumstances." *Id.* " '[A]cts relied upon as constituting a waiver of the provisions of a contract must be inconsistent with an intention to insist upon enforcing such provisions.' " *Id.* at 643–44, 343 A.2d 529 (quoting *Canaras v. Lift Truck Services, Inc.,* 272 Md. 337, 360, 322 A.2d 866 (1974)). The question of whether there has been a waiver of a contractual right is generally one of fact. *Id.* at 644, 343 A.2d 529 (citing *Fidelity and Casualty Co. of N.Y. v. Dulany,* 123 Md. 486, 496, 91 A. 574 (1914)). *See also Univ. Nat'l Bank v. Wolfe,* 279 Md. 512, 523, 369 A.2d 570 (1977) ("whether subsequent conduct of the parties amounts to a modification or waiver of their contract is generally a question of fact to be decided by the trier of fact").

Appellant also asserts that the actual written language of the QDROs, *i.e.,* that "[i]n the event the participant is receiving a monthly annuity at qualification, *the alternate payee will commence payment as soon as administratively possible,*" constituted a modification of the earlier Separation Agreement, having the effect that the parties agreed, through

the modification, to pay pension benefits from the date of the QDRO. Appellant's proposed interpretation of the language of the agreement presents a question of law. *See Hearn v. Hearn,* 177 Md.App. 525, 534, 936 A.2d 400 (2007) (citing *Towson v. Conte,* 384 Md. 68, 78, 862 A.2d 941 (2004)). "When we interpret a contract, we examine the contract as a whole, in order to determine the intention of the parties. We also examine 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of the execution.'" *Janusz,* 404 Md. at 540, 947 A.2d 560 (internal citations omitted).

The trial judge in the case *sub judice* did not provide a written memorandum or an oral explanation for concluding that there was no merit to appellant's contention that appellee had waived her right to collect the arrears. Maryland Rule 2–522(a) provides:

In a contested court trial, the judge, before or at the time judgment is entered, shall prepare and file or dictate into the record a brief statement of the reasons for the decision and the basis of determining any damages.

The facts and circumstances of the parties at the time of execution of the second QDRO, however, are not in dispute:

1. Appellant, in September 2001, made no effort to contact appellee to alert her to the fact of his retirement or the commencement of payment of his pension benefits.

2. Neither party made any attempt to contact the other until appellant received a proposed QDRO from appellee's attorney in February or March of 2006.

3. Appellee assumed that appellant would retire at the age of sixty-five and, accordingly, having had no contact with appellant, approached an attorney to effectuate receipt of her portion of appellant's pension benefits in 2006 when appellant reached the age of sixty-five. Appellee subsequently learned that appellant had, in fact, retired in 2001.

4. Appellee submitted a QDRO in order to access future payments from appellant's pension benefits, as agreed to by the parties in their Separation Agreement.

5. The QDRO entered by the Circuit Court on March 29, 2006 and executed by the parties was subsequently rejected by the pension plan administrator and a second, amended QDRO, signed by both parties and entered by the circuit court on April 23, 2007, authorized appellee to begin receiving pension benefits in September 2007, in the form of a lump sum payment of $7,710.65 and subsequent payments of $441.46 per month.

6. Neither of the QDROs addressed appellee's claim to pensions arrears accumulated from the time of appellant's retirement to the point in time when the QDROs were filed.

7. Appellee filed her complaint on January 15, 2008, to recover $24,515.93 in pension arrears accrued during the seventy-three month period between appellant's retirement and appellee's receipt of the first partial payment pursuant to the approved QDRO.

Although a QDRO may serve to modify an earlier separation agreement of the parties, *Janusz*, 404 Md. at 541, 947 A.2d 560, we reject the premise of appellant's argument that the amended QDRO, signed by both parties and entered by the circuit court on April 23, 2007, modified the terms of the separation agreement. Unlike the circumstances in *Janusz*, the retiree in this case never became ineligible for the benefits that the parties agreed to in the separation agreement and there is no request for a rescission of the original contract or a claim of unjust enrichment. Notwithstanding that the trial judge did not prepare and file or dictate into the record a brief statement of the reasons for her decision, the above undisputed facts demonstrate that appellee filed her complaint on January 15, 2008, to recover $24,515.93, four months after she had begun receiving her pension benefits in September 2007. In light of the reasonable belief on the part of appellee that appellant would retire at age sixty-five and her prompt efforts to effectuate payment immediately after discovery that appellant had retired, the record in this case, we are persuaded, reflects no conduct on the part of appellee which indicates that she sat on her rights. We are further satisfied that the provision that "the alternate payee will commence payment as

soon as administratively possible" cannot, as a matter of law, be construed as a modification of the separation agreement.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**